FILED

06/14/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0197

DA 20-0197

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 116

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

RICHARD D. HINMAN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-19-142
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Kristina L. Neal (argued), Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Mardell Ployhar (argued), Assistant Attorney General, Helena, Montana

            Eileen Joyce, Butte-Silver Bow County Attorney, Samm T. Cox, Chief Deputy County Attorney, Butte, Montana

Argued: April 8, 2022
Submitted: April 12, 2022
Decided: June 14, 2023

Filed:

                      _____
                            Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Richard Hinman appeals an October 2, 2019 Order entered in the Second Judicial District Court, Butte-Silver Bow County. The District Court denied Hinman's motion to dismiss the State's felony charge against him for failure to register as a sexual offender.

¶2     Hinman was convicted of sexual assault in 1994 and has served and discharged his criminal sentence on that charge. At the time, Montana's Sexual Offender Registration Act (now the Sexual or Violent Offender Registration Act, SVORA) required Hinman to maintain registration for 10 years, with annual verification through mail. The Montana Legislature subsequently amended the SVORA requirements to include more onerous steps and applied them retroactively to previously convicted registrants. When Hinman was charged with failure to register in 2019, he argued that the charges should be dismissed because the amended SVORA requirements rendered the statute an unconstitutional *ex post facto* punishment for his earlier crime. After the District Court denied Hinman's motion, he pleaded guilty to the charge while reserving his right to appeal.

¶3     We restate the issue on appeal as follows:

> *Did retroactive application of the Sexual or Violent Offender Registration Act violate the prohibition against ex post facto punishment in Article II, Section 31, of the Montana Constitution?*

¶4     We reverse, and we hold that SVORA, as amended since 2007, is punitive in nature. The requirements brought on by those amendments cannot be retroactively applied to defendants whose convictions predate them.[1]

---

[1] Our conclusion that the SVORA, as amended since 2007, violates Montana's *ex post facto* clause is dispositive and we therefore do not address Hinman's restoration-of-rights argument.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5      When Hinman pleaded guilty to a sexual assault charge in 1994, Montana's SVORA was relatively new.  The law, passed in 1989, required convicted sexual offenders to annually verify their residential addresses with county law enforcement and to timely update their information following any change of address.  The duty to register would expire 10 years after the initial date of registration.  The 1989 law also contained provisions relating to sentencing for sexual offenses, and it required sentencing courts to inform defendants in writing of their duty to register under the Act.  *See* 1989 Mont. Laws ch. 293.

¶6      Thus, Hinman's 1994 guilty plea was negotiated with awareness of the SVORA scheme in effect at that time.  Hinman served and discharged his sexual assault sentence— he was incarcerated from July 1994 to July 2000—and 10 years passed from the date of his initial registration.  By that time, however, the Montana Legislature had amended SVORA several times, and this Court had issued an important decision interpreting it.

¶7      In 1995, the Legislature extended the registry requirement to certain violent offenses, and it added photographs and fingerprints to the material required at initial registration.  1995 Mont. Laws ch. 407, § 7.  The 1995 law also altered the 10-year requirement: the duty to register would expire after 10 years only as long as the registrant did not re-offend.  1995 Mont. Laws ch. 407, § 9.  If someone committed another SVORA offense or was convicted of failure to register during the 10 years, they would have to register for life.  Re-offenders could petition a district court for removal from the registry 10 years after the date of their last conviction. 1995 Mont. Laws ch. 407, § 9.  The 1995

law also made public the names of individuals on the sexual offender registry. 1995 Mont. Laws ch. 407, § 11.

¶8    In 1997, the Legislature added a system whereby trained evaluators would assess individuals convicted of SVORA offenses and give them a tiered designation—Levels 1, 2, and 3 denoting increasing risk of committing another sexual offense. 1997 Mont. Laws ch. 375, § 12. The 1997 law expanded the amount of information about registrants that was public, depending on the tiered risk level of the offender. 1997 Mont. Laws ch. 375, § 11. These amendments also removed the 10-year expiration of the duty to register for those who did not re-offend; now, they could only be removed from the registry by petitioning a district court after 10 years had passed. 1997 Mont. Laws ch. 375, § 11. And—importantly—the 1997 law applied the SVORA scheme retroactively and required anyone convicted of a sexual offense since 1989 to follow the expanded scheme. 1997 Mont. Laws ch. 375, § 18. Additional laws passed in 1999 and 2001 made clear that registrants' addresses were public information and could be accessed on the internet. 1999 Mont. Laws ch. 219, § 1; 2001 Mont. Laws ch. 222, § 2.

¶9    In 2003, this Court issued a decision finding that the intent and effect of SVORA was not to punish people convicted of sexual offenses. Rather, the Act served as a regulatory scheme collecting and disseminating information meant to reduce recidivism and help the public mitigate potential harms. *See State v. Mount*, 2003 MT 275, ¶ 87, 317 Mont. 481, 78 P.3d 829. Thus, the permissible retroactivity of SVORA appeared settled in 2012 when Hinman was fined after his first conviction for failure to register (and did not

4

appeal). Even though well over 10 years had passed since his initial registration, and even though his conduct predated the new laws, the updated scheme applied.

¶10 By 2019, when Hinman again faced a charge of failure to register, the SVORA scheme had grown yet further. Amendments in 2007, 2013, 2015, and 2017 have included the following: "Level 2" offenders (like Hinman) must pass 25 years without a re-offense or failure to register before they can petition for removal from the registry;[2] "Level 3" offenders cannot petition to do so at all;[3] registrants must supply law enforcement with DNA samples, email addresses, social media names, vehicle descriptions, license plate numbers, social security numbers, and workplace and school addresses;[4] law enforcement is empowered to supply most of that information to the public;[5] registrants must update address, work, and school information within three days of a change;[6] all updates as well as periodic verifications and new photographs must be conducted in-person with law enforcement;[7] transient registrants must check in with law enforcement monthly;[8] and any

---

[2] Section 46-23-506(3), MCA; 2007 Mont. Laws ch. 483, § 22.

[3] Section 46-23-506(1), (3), MCA; 2007 Mont. Laws ch. 483, § 22.

[4] Section 46-24-504(3), MCA; 2007 Mont. Laws ch. 483, § 20; 2013 Mont. Laws ch. 101, § 2; 2015 Mont. Laws ch. 110, § 4.

[5] Section 46-23-508(1)(b), MCA; 2007 Mont. Laws ch. 483, § 23.

[6] Section 46-23-505, MCA; 2007 Mont. Laws ch. 483, § 21.

[7] Sections 46-23-504(6), -505, MCA; 2007 Mont. Laws ch. 483, §§ 20-21. SVORA uses the phrase "registration agency" to describe the entity with which registrants interact. A "registration agency" under the Act is a municipal police department or county sheriff's office. Section 46-23-502(6), MCA.

[8] Section 46-23-504(5), MCA; 2007 Mont. Laws ch. 483, § 20.

time registrants leave their county of residence for more than 10 days, they have to re-register in whatever county they travel to and re-register upon return.[9]

¶11    Hinman challenges his 2019 failure-to-register charge on the grounds that our earlier reasoning about the nonpunitive nature of SVORA no longer holds true today. Hinman cites a growing body of caselaw in other jurisdictions regarding the constitutionality of applying similar laws retroactively, and he points to the breadth of collateral consequences for SVORA registrants that are apparent today but did not exist or were not well understood in 1989 or 2003. The State, by contrast, argues that we should hold fast to *Mount* and maintain its reasoning and outcome as applied to the present SVORA provisions and Hinman's case.

## STANDARD OF REVIEW

¶12    "Alleged violations of the *Ex Post Facto* Clauses of the United States and Montana Constitutions are constitutional questions over which we exercise plenary review." *Tipton v. Mont. Thirteenth Judicial Dist. Ct.*, 2018 MT 164, ¶ 9, 392 Mont. 59, 421 P.3d 780 (citing *State v. Brander*, 280 Mont. 148, 150-51, 930 P.2d 31, 33 (1996)).

## DISCUSSION

¶13    Our analysis begins with two constitutional provisions: the *ex post facto* clause in Article I, Section 10, of the United States Constitution and the *ex post facto* clause in Article II, Section 31, of the Montana Constitution. These constitutional rules generally accomplish the same protective purpose—to prevent the retroactive application of criminal

---

[9] Section 46-23-505(4)-(5), MCA; 2013 Mont. Laws ch. 283, § 1.

laws. Our case law interpreting the Montana provision has developed in connection with United States Supreme Court decisions addressing the federal *ex post facto* clause. The interpretive rule most relevant to this case is that a "civil sanction will implicate *ex post facto* concerns only if it can fairly be characterized as punishment." *Frazier v. Mont. Dep't of Corr.*, 277 Mont. 82, 85, 920 P.2d 93, 95 (1996). To decide whether a law operates more like criminal punishment than civil regulation, we have applied an "intents-effects" test derived from federal case law. *Mount*, ¶¶ 26, 33-37 (citing *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140 (2003)). In essence, this test asks whether the Legislature intended the law to punish those subject to it. If the intent was not punitive, then the next question is whether the law is nonetheless punitive in effect. We have answered this question by assessing the law under multiple factors (discussed below) and considering whether, in totality, it acts as punishment.

¶14 The basis for our analysis of whether the present SVORA is punitive does not arise in a vacuum but rather exists within a larger jurisprudential context. *Mount*, for example, found its footing in the U.S. Supreme Court's reasoning about an Alaska sex offender registration law. In *Smith*, the U.S. Supreme Court held that Alaska's law did not violate the *ex post facto* clause in the federal constitution because it was not punitive.[10] *Smith*, 538

---

[10] The Alaska Supreme Court revisited that state's sex offender registry law in 2008, this time applying the *ex post facto* clause in the state constitution. The court applied the same mode of analysis that the U.S. Supreme Court had applied in *Smith* but concluded that the registry law was in fact punitive in effect. "[W]e have never endorsed federal *ex post facto* analysis as superseding or limiting our independent consideration of Alaska's *ex post facto* prohibition. Nor have we indicated that federal interpretation of the federal *ex post facto* prohibition prevents us from reaching a different, and more protective, result under the Alaska Constitution." *Doe v. State*, 189 P.3d 999, 1005 (Alaska 2008).

7

U.S. at 105-06, 123 S. Ct. at 1154. Later the same year, *Mount* addressed Montana's SVORA, which was then relatively similar to the Alaska law. In that decision, we explicitly adopted the U.S. Supreme Court's analytical framework and the "intents-effects" test. *Mount*, ¶ 26.

¶15 At the first step in that framework, we determined in *Mount* that Montana's SVORA was not intended to be punitive; it was simply a "civil regulatory scheme intended to protect the public." *Mount*, ¶¶ 45, 49. At the second step, we considered whether the effect of the law, in totality, was nonetheless punitive. *Mount*, ¶¶ 50-88. Following the U.S. Supreme Court's analysis from *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554 (1963), we applied a seven-factor test to the SVORA in effect at that time, considering "(1) whether the law imposes an affirmative restraint or disability; (2) the historical treatment of the law; (3) a finding of scienter; (4) whether the law was traditionally aimed at punishment; (5) whether the law applies to criminal behavior; (6) whether the law has a nonpunitive purpose; and (7) the excessiveness of the law in application." *Mount*, ¶ 35. The result of our analysis was a conclusion that the SVORA under review in *Mount* was, in totality, not punitive in effect, and the law could be applied retroactively. *Mount*, ¶¶ 89-90.

¶16 In *Mount*, this Court reasoned that a scheme which merely increases the accessibility of already-public criminal records information and requires those with such records to periodically mail in address verification is not as onerous as criminal punishment and can fall on the civil regulation side of the line. *See Mount*, ¶ 63. The meaningful substance of our analysis in *Mount* consisted of several key observations about why, in totality, the pre-2007 SVORA was non-punitive in effect. We observed that the law at the time

8

imposed only "minor and indirect" affirmative restraints on registrants because all it required them to do, after an initial in-person registration, was to annually return mailed verification forms within 10 days (and submit new forms upon a change of address). *Mount*, ¶¶ 51-56. We linked the public stigma of sex-offender status not to the impact of the registry but rather to the fact of the underlying criminal conviction. *Mount*, ¶¶ 62-63. And we determined that the relatively narrow breadth of the registry—consisting of names, addresses, and initial photographs and fingerprints of people with certain criminal records—was reasonably limited to only the necessary information for the public protective purpose and imposed no excessive burden on the registrant. *Mount*, ¶¶ 81-88. Our analysis in *Mount* of whether SVORA imposed an "affirmative restraint or disability" on registrants noted that verification by mail is a minor and indirect restraint and does not affect someone's physical movement. *Mount*, ¶¶ 54-56. *Mount* stressed that an in-person appearance was only required once at initial registration. *Mount*, ¶¶ 54-56. Our source of this analysis, the U.S. Supreme Court in *Smith*, repeatedly cited the lack of in-person updates and the freedom to move about "with no supervision." *Smith*, 538 U.S. at 102, 123 S. Ct. at 1152. We concluded in *Mount* that the simple SVORA scheme in effect at that time could permissibly be applied retroactively. *Mount*, ¶ 90. We turn now to Hinman's new challenge to SVORA retroactivity.

¶17    Preliminarily, it is important to take care not to define as punishment, under the *ex post facto* clause, anything that the public may experience as deleterious. When cases like *Mount* and *Smith* distinguish between civil regulatory schemes and criminal punishments, these categories draw abstract lines necessary to prevent evolving legal doctrines from

9

swallowing themselves or each other. We have thus clarified, for example, that "[a] statute is *not* 'retroactive' [in violation of the *ex post facto* clause] merely because it draws upon antecedent facts for its operation." *State v. Coleman*, 185 Mont. 299, 317, 605 P.2d 1000, 1012 (1979) (emphasis in original). Purely civil mechanisms like the adjustment of interest on delinquent taxes or adjustment of the rules for public service retirement benefits can and have been applied retroactively. *See O'Shaughnessy v. Wolfe*, 212 Mont. 12, 13-14, 685 P.2d 361, 362 (1984); *Davidson v. Love*, 127 Mont. 366, 369, 264 P.2d 705, 706 (1953). Similarly, standards for granting or revoking professional licenses are civil regulations by nature, not punishment, though they often reflect consequences for antecedent conduct.

¶18     Here, the task is to decide when State-imposed consequences which follow a criminal conviction should—to comport with the constitution—be part of the criminal process at the time of sentencing. Being subject to SVORA today is clearly generally understood to be part of one's punishment for a sexual crime. It's fair to assume that no typical citizen would accept the level of intrusion and public surveillance inherent in the registry without first expecting that they be tried, convicted, and sentenced for a relevant crime. It is one thing to have your already-public criminal record made more accessible and to periodically update your address with the record-keepers. It is another to be placed under a probationary surveillance system in perpetuity which is designed to facilitate social ostracism. It defies common sense and sound judgment not to view the latter situation, the SVORA scheme since 2007, as punishment for a person's sexual crime. All the features

10

of the Act that supported our decision in *Mount* have changed dramatically since the law's amendments in 2007, 2013, 2015, and 2017.

¶19 Consider first our analysis of whether SVORA imposes an "affirmative restraint or disability" on registrants. The SVORA amendments in 2007 and 2013 fundamentally abandoned the limited nature of the restraint. Now, registrants must appear in-person with local law enforcement for every periodic verification and new photography (every 90 days for Level 3 offenders, six months for Level 2 offenders, and annually for Level 1 offenders). Sections 46-23-504(6), -505, MCA. If a registrant has a change of address, employment, or school enrollment, they have three days to appear in-person with the update before they are in violation of the Act and face new criminal charges. Section 46-23-505, MCA. Registrants who lack a permanent address must physically appear before law enforcement monthly. Section 46-23-504(5), MCA. Level 3 offenders are prohibited from residing near schools, playgrounds, or other locations that serve minors. Section 45-5-513, MCA. Any registrant who departs from their county of residence for more than 10 days must register anew (and in person) in whatever county they are in on the 11th day, and in any subsequent county they enter for more than 24 hours, in addition to renewing registration in their county of residence upon return. Section 46-23-505(4), (5), MCA. There is simply no question that these rules place affirmative physical restraints on SVORA registrants that were not part of the scheme we addressed in *Mount*. Requiring such regular in-person contact with law enforcement upon

11

any change in address, work, school, or travel is akin to being placed on permanent probation, and the Court concludes that these provisions have an effect like punishment.[11]

¶20    On the question of whether registration imposes any "disability" on its subjects, the U.S. Supreme Court emphasized in *Smith* that they had "no evidence that the [registration act] has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords." *Smith*, 538 U.S. at 100, 123 S. Ct. at 1151.  We echoed this reasoning in *Mount*. *Mount*, ¶ 62.  We reasoned that the SVORA registry did nothing but help the public access criminal records and that any collateral consequences, social retribution, or stigma resulted from the fact of the conviction itself, not SVORA.

¶21    But the analogy to public criminal records simply no longer holds true.  It is undeniable that today, there is a fundamental difference between SVORA's widespread online dissemination of information and the possibility of a neighbor or employer looking up an individual criminal record.  For one thing, much of the information now provided by SVORA is not part of a criminal record.  The law since 2007 has included updated photographs of registrants at each periodic verification.  Section 46-23-504(6)(c), MCA.

---

[11] The Court of Appeals of Maryland noted that Maryland's similar sex offender registry "obligations have the same practical effect as placing [the registrant] on probation or parole." *Doe v. Dep't of Pub. Safety & Corr. Serv.*, 62 A.3d 123, 139 (Md. 2013).  The Supreme Courts of numerous other states, including Indiana, Maine, Michigan, New Hampshire, Ohio, and Oklahoma, have all stressed the distinction between *Smith*'s reasoning about mail-in verification and the frequent in-person reporting requirements in modern registry laws. For this and other reasons, all those courts found their state registry laws punitive under *ex post facto* analysis. *See Wallace v. State*, 905 N.E.2d 371, 379-80 (Ind. 2009); *State v. Letalien*, 2009 ME 130, ¶¶ 35-37, 985 A.2d 4; *People v. Betts*, 968 N.W.2d 497, 511 (Mich. 2021); *Doe v. State*, 111 A.3d 1077, 1094 (N.H. 2015); *State v. Williams*, 952 N.E. 2d 1108, 1111-12 (Ohio 2011); *Starkey v. Okla. Dep't of Corr.*, 305 P.3d 1004, 1022-23 (Okla. 2013).

For Level 2 offenders like Hinman, the registry publicizes vehicle information and license plate numbers. Section 46-23-508(b), MCA. Furthermore, although an employer might have researched a prospective employee's criminal background in the absence of SVORA, with the Act, employers are now aware that any registrant they hire will be required to continually apprise law enforcement of their affiliation; the long-term surveillance scheme now incorporated into SVORA certainly sweeps up more than the mere fact of a conviction and certainly exacerbates the stigma and collateral social consequences of being convicted of a sexual offense.

¶22 Moreover, the development of sex offender registries over the past several decades has generated additional collateral consequences that can only be attributed to the registries themselves. For one example, a 2017 federal law requires the U.S. State Department to affix conspicuous identifiers to the passports of people belonging to sex offender registries. *See* 22 U.S.C. § 212b. For another, federal regulations from the Department of Housing and Urban Development prohibit public housing agencies from admitting into their programs anyone subject to a lifetime sex offender registration requirement. *See* 24 C.F.R. 982.553(a)(2) (2021). Thus, the stigma and other collateral effects of the SVORA registry cannot fairly be attributable to the criminal record alone—the registry itself is the cause of these additional consequences. The very point of SVORA's existence is to empower a certain degree of public response that would not occur otherwise.[12]

---

[12] As the Indiana Supreme Court wrote in a similar case, "it strains credulity to suppose that the Act's deterrent effect is not substantial, or that the Act does not promote 'community condemnation of the offender'. . . ." *Wallace*, 905 N.E.2d at 382. The New Hampshire Supreme Court also noted that "courts have acknowledged that many of the negative effects that registrants

¶23 The final premise generating *Mount*'s "non-punitive" determination was the idea that the burdens of the SVORA registry were not excessive in relation to its aims. *Mount*, ¶¶ 81-88. We emphasized that the Act's structure was well tailored to carrying out its public protective purpose while collecting and disseminating only limited information. Since *Mount*, however, many things have changed. First, a growing body of research into the effectiveness of sex offender registries has cast significant doubt on their capacity to prevent recidivism.[13] Second, the burdens and intrusiveness of SVORA have increased substantially through the subsequent amendments. Today, registrants must supply law enforcement with DNA samples, driver's license numbers, vehicle information, email addresses, and social media screen names, in addition to the timely in-person updates on residence, work, and education discussed above. Sections 46-23-504(3), -505(1), MCA. The effect is a considerable sacrifice of privacy and a permanent system of state surveillance. On balance, faced with the unclear efficacy of the registry at achieving its

---

experience flow from the crime they committed, but the registry, particularly because it is publicly available online, increases these effects exponentially." *Doe,* 111 A.3d at 1095.

[13] *See People ex rel. T.B.*, 489 P.3d 752, 768 (Colo. 2021) ("[A] number of studies indicate that registration requirements have no statistically significant effect on reducing recidivism rates among offenders.") (citing Molly J. Walker Wilson, *The Expansion of Criminal Registries and the Illusion of Control*, 73 La. L. Rev. 509, 523 n.93 (2013) (collecting studies)); *Betts*, 968 N.W.2d at 514 (Mich. 2021) ("[A]t minimum, the [registry's] efficacy is unclear."); Mariel Alper & Matthew R. Durose, U.S. Dep't of Justice, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-2014)* (May 2019), https://perma.cc/N4KW-2XN9 (concluding that sex offenders are less likely than other offenders to be rearrested for any crime); Beth M. Huebner et al., *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri* (July 2013) https://perma.cc/SPJ8-KK2X (concluding that residency restrictions "are unlikely to mitigate or reduce the risk of recidivism among sex offenders"); J.J. Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161, 192 (2011).

aims and the greatly broadened scope of its burdens, we can no longer conclude that SVORA's expanded collection and dissemination of information is narrowly tailored to the scheme's public protective purpose. The present SVORA structure clearly points toward recognizing the Act as punitive in effect.

¶24     We conclude that the SVORA structure in place since 2007 is punitive and therefore cannot apply retroactively under the *ex post facto* clause. Unlike the pre-2007 SVORA, the law today places onerous, life-long affirmative restraints on registrants that significantly hinder their liberty and deprive them of privacy. These burdens and the scope of information collected are excessive in relation to the civil regulatory goal. Criminal conduct is undisputedly the trigger for the registry requirements, and the registry itself, by design, implicates a host of collateral consequences and encourages social stigma. These characteristics are emblematic of criminal punishment.

¶25     We do not consider or judge today the social policy motivating the SVORA registry or its constitutionality when applied to conduct that occurs after the restrictions' enactment. This decision determines only that SVORA since its amendments in 2007, and thereafter, effectively functions as additional punishment for crimes. Under our constitution, citizens have the right to be free from retroactive punishment. If the people, through their legislature, wish to create harsh and long-lasting consequences for certain crimes, they may do so, but it is unconstitutional to reach back years or decades and alter the punishments from previous convictions or retroactively punish conduct that was once lawful. By amending SVORA to create a punitive scheme of harsh and lifelong consequences for

sexual offenses, the State created a structure that it can only constitutionally apply to convictions in a prospective manner.

¶26 The Legislature included a severability clause in its 2007 SVORA amendments: "If a part of [SVORA] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [SVORA] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications." 2007 Mont. Laws ch. 483, § 29. Because our *ex post facto* analysis concerns the punitive nature of the registry requirements "in totality," our present task cannot include picking and choosing exactly which of the post-2007 amendments tip SVORA into punitive territory, or which combination of them might tip it back out. *Mount*, ¶ 36. We will, however, respect the precedent set by our conclusion about the SVORA in effect at the time of *Mount* and respect our typical practice of applying severability clauses when they apply to rescue the constitutionality of a law. *State v. Theeler*, 2016 MT 318, ¶ 12, 385 Mont. 471, 385 P.3d 551. Thus, we hold that the present SVORA scheme that includes the amendments from 2007 and thereafter cannot constitutionally be applied retroactively.

## CONCLUSION

¶27 The District Court's order denying Hinman's motion to dismiss is reversed. Hinman's charge for failing to register is dismissed because SVORA's retroactive application to Hinman violated the *ex post facto* clause in Article II, Section 31, of the Montana Constitution.

/S/ LAURIE McKINNON

16

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON


Chief Justice Mike McGrath, specially concurring.

¶28    I agree with the result reached by the Majority.  I would decide this case on alternative grounds, however.  I would find SVORA unconstitutional under Article II, Section 28(2), of the Montana Constitution, and would overrule *Mount* and its progeny as they pertain to the protections afforded by that Section.

¶29    Hinman received a twelve-year prison sentence for his 1994 conviction of sexual assault.  *See In re Hinman*, 271 Mont. 167, 895 P.2d 609 (1995).  His guilty plea was negotiated pursuant to the then-new SVORA scheme, which underwent substantial legislative amendment in subsequent years.

¶30    Hinman discharged his sexual assault sentence in 2006 and completed his ten-year registration period by 2016.  By that time, however, the Montana Legislature had significantly amended the SVORA scheme to include more onerous steps and applied them retroactively to previously-convicted individuals, and this Court had issued a decision upholding the amended scheme.  *See State v. Mount*, 2003 MT 275, 317 Mont. 481, 78 P.3d 829.

¶31    When Hinman was charged with failure to register in 2019, he argued that the charges should be dismissed because it was unconstitutional to retroactively apply the amended SVORA requirements to his earlier crime for which he had already discharged

the sentence imposed. After the District Court denied Hinman's motion, he pleaded guilty to the charge while reserving the right to appeal. Like the Majority, I would reverse.

¶32 The Majority decides this case on Hinman's challenge to his 2019 failure-to-register charge on the grounds that our earlier reasoning, finding SVORA "nonpunitive" and thus not an *ex post facto* concern, no longer holds true today. However, Hinman also argues that retroactive application of SVORA violates Article II, Section 28(2), of the Montana Constitution, which guarantees that "full rights are restored" after the discharge of a criminal sentence. I would find this issue dispositive as applied in Hinman's case and, therefore, conclude that the Majority's resolution of this case on the *ex post facto* issue is unnecessary.

¶33 Article II, Section 28(2), of the Montana Constitution guarantees that "[f]ull rights are restored by termination of state supervision for any offense against the state." Mont. Const. Art. II, § 28(2). The Montana Legislature codified this guarantee in § 46-18-801(2), MCA: "[I]f a person has been deprived of a civil or constitutional right by reason of conviction for an offense and the person's sentence has expired or the person has been pardoned, the person is restored to all civil rights and full citizenship, the same as if the conviction had not occurred."

¶34 Hinman contends that the retroactive application of the SVORA requirements to him after he discharged his sentence in 2006 denied him the full restoration of his rights guaranteed to him upon termination of state supervision by Article II, Section 28(2).[1] In

---

[1] Notably, after Hinman's appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967) due to *Mount's* on-point precedent, this Court

18

particular, he contends that the State has failed to restore to him his right of privacy as set forth in Article II, Section 10, of the Montana Constitution. *See* Mont. Const. Art. II, § 10 ("The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."); *see also* Mont. Const. Art. II, § 4 ("The dignity of the human being is inviolable."); Mont. Const. Art. II, § 3 (inalienable rights of all persons include "enjoying and defending their lives and liberties" and "seeking their safety, health and happiness in all lawful ways"). Hinman points out that the current SVORA scheme requires him to make periodic updates, every six months, in person, with law enforcement. Section 46-23-504(6)(a)-(c), MCA. If Hinman, or any registrant, has a change in address, employment, or school enrollment, they are in violation of the law unless they appear, in person, to apprise law enforcement of the change within three days. Section 46-23-505, MCA. Furthermore, registrants must re-register, in person, any time they leave their county of residence for ten days or more, appearing before law enforcement in whatever county they travel to and again in their home county upon return. Section 46-23-505(4), (5), MCA. If a registrant suffers a period of homelessness and lacks a permanent address, SVORA now requires the individual to physically check in with law enforcement every month. Section 46-23-504(5), MCA.[2] Moreover, the information that

---

unanimously denied the motion, concluding that a "nonfrivolous issue exists as to whether this Court should reconsider our determination in *State v. Mount*[.]" *Mount* contained analysis of the *ex post facto* issue and the restoration of rights issue, both of which counsel dutifully argued in briefing and at significant length during oral argument before this Court.

[2] It was this context that resulted in Hinman's present failure-to-register charge. Butte-Silver Bow Law Enforcement deputies mailed a verification form to Hinman's last known address, advising him to appear in person to verify his information, as required by § 46-24-504(6)(c), MCA. Hinman's housing status was transient at the time; he was attempting to establish residence at a

registrants must now supply to law enforcement has expanded to include email addresses and social media accounts, vehicle and license plate information, workplace and school information, and, perhaps most notably, DNA samples. Section 46-23-504(3), MCA.

¶35 The State counters that our 2003 decision in *Mount* established that privacy rights are not among the rights to which an individual is entitled to be restored under the constitutional guarantee of Article II, Section 28(2). Indeed, in *Mount*, this Court rejected a contention that the retroactively-applicable disclosure requirements of an earlier version of SVORA failed to restore rights upon registrants who had already discharged their sentences, concluding that it did "not deprive Mount of any 'rights' under Article II, Section 28, of the Montana Constitution." *Mount*, ¶ 99. In *Wagner v. State*, issued shortly after *Mount*, this Court concluded that *Mount* established that Article II, Section 28(2) protects only "civil and political rights of citizenship" and that such rights "do not include or equate to individual rights enumerated in either the Montana or United States Constitutions." 2004 MT 31, ¶ 16, 319 Mont. 413, 85 P.3d 750. Thus, *Mount*, particularly as interpreted and relied upon in *Wagner*, appears to state that Article II, Section 28(2) entitles those who have completed their sentence to *no* restoration of privacy rights.

¶36 Hinman asks us to overrule *Mount* and *Wagner's* excision of the right of privacy from the ambit of the protections guaranteed by Article II, Section 28(2).

---

different address where he had recently stayed, but he had not appeared to regularly apprise law enforcement of his homelessness, as § 46-23-504(5), MCA, required. The State charged him with a felony for failure to register. *See* § 46-23-507(1), MCA.

20

¶37 The fundamental doctrine of *stare decisis* "reflects our concerns for stability, predictability and equal treatment" and is of "central importance to the rule of law." *State v. Gatts*, 279 Mont. 42, 51, 928 P.2d 114, 119 (1996); *Beckman v. Butte-Silver Bow Cnty.*, 2000 MT 112, ¶ 20, 299 Mont. 389, 1 P.3d 348. While the doctrine provides a strong preference for maintaining a precedent despite viable alternatives, "stare decisis does not require us to follow a manifestly wrong decision." *Beckman*, ¶ 20; *McDonald v. Jacobsen*, 2022 MT 160, ¶ 30, 409 Mont. 405, 515 P.3d 777; *Certain v. Tonn*, 2009 MT 330, ¶ 19, 353 Mont. 21, 220 P.3d 384 ("Faced with viable alternatives, stare decisis provides the 'preferred course.'"); *State ex rel. Sparling v. Hitsman*, 99 Mont. 521, 525, 44 P.2d 747, 749 (1935).

¶38 Though our terse treatment of the restoration of rights claim in *Mount* was far from comprehensive,[3] the decision rested on two grounds: (1) that privacy was not one of the rights protected by Article II, Section 28(2), and (2) that the infringement upon the fundamental right to privacy was acceptable in any event as the statute was narrowly tailored to pursue a compelling government interest, surviving strict scrutiny analysis. I examine each in turn.

¶39 Article II, Section 28(2) guarantees that "*[f]ull* rights are restored by termination of state supervision for any offense against the state." Mont. Const. Art. II, § 28(2) (emphasis added); *see* § 46-18-801(2), MCA ("[I]f a person has been deprived of a civil or constitutional right by reason of conviction for an offense and the person's sentence has

---

[3] The vast majority of the *Mount* Opinion, and the entirety of the *Mount* Dissent, were dedicated to addressing an *ex post facto* argument.

21

expired or the person has been pardoned, the person is restored to *all* civil rights and full citizenship, *the same as if the conviction had not occurred*." (emphasis added)). Nowhere does the constitutional text state that certain rights, such as the right to privacy, are exempt from the unambiguous requirement that "full" rights are to be restored.

¶40 Nonetheless, *Mount* held that "[t]he language of Article II, Section 28, of the Montana Constitution does not afford Mount the benefit he seeks here." *Mount*, ¶ 98. This conclusion did not rest on any interpretation of the actual text but instead relied upon two cited passages. The first was Delegate James' statement introducing the provision at the 1972 Constitutional Convention that "once a person who has been convicted has served his sentence and is no longer under state supervision, he should be entitled to the restoration of all civil and political rights, *including* the right to vote, hold office, and enter occupations which require state licensing." *Mount*, ¶ 95 (emphasis added) (quoting Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, Vol. V, p. 1800). Second, *Mount* cited to our 1977 statement, made in the context of addressing use of evidence of a prior felony conviction for impeachment of a witness, that the constitutional provision "refers to those rights commonly considered political and civil rights incident to citizenship *such as* the right to vote, the right to hold public office, the right to serve as a juror in our courts and the panoply of rights possessed by all citizens under the laws of the land." *Mount*, ¶ 96 (emphasis added) (quoting *State v. Gafford*, 172 Mont. 380, 389-90, 563 P.2d 1129, 1134 (1977)). *Mount*, as interpreted and followed in *Wagner*, misconstrued the words "such as" and "including" prefacing the listed rights to mean "only," notwithstanding the references to a "panoply of rights" and "*all* civil and political rights"

22

in the cited passages. (Emphasis added.) *See Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2, 98 S. Ct. 2588, 2592 (1978) (describing privacy as a civil right). The result was a manifestly erroneous conversion of a set of examples into an exhaustive list.

¶41    There is simply no support for the conclusion that, while the term "full rights" includes professional state licensing, it does not extend to rights so fundamental to our conception of individual freedom as to have been explicitly enshrined in the Montana Constitution's Article II Declaration of Rights.[4]    Moreover, a fuller reading of the Constitutional Convention's brief treatment of the provision demonstrates no support for *Mount's* reading. The core of Delegate James' statement in introducing the provision was that the drafting committee was concerned that:

> prevention and reformation cannot be realized unless the ex-convict can readily move back into society as an equal participant in community affairs. Surely to rehabilitate one and attempt to insure that he has the opportunity to become a full member of the community requires that he be restored to *the same rights, privileges and immunities as other citizens*.

Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1800 (emphasis added.)

¶42    Under this line of reasoning, it is unnecessary to attempt a complete cataloguing of all the various "rights" to which an individual is entitled to have restored under Article II, Section 28(2) in order to conclude that the fundamental right to privacy set forth in Article II, Section 10 is certainly among them. *Mount* was manifestly wrong when it concluded

---

[4] Such a conclusion would, ironically, seemingly guarantee to someone like Hinman the restoration of a license to operate a daycare or work as a pediatrician while simultaneously offering no protection whatsoever from the most unjustified of privacy intrusions.

that the restoration of "full rights" guaranteed by Article II, Section 28(2) inexplicably excluded the fundamental right to privacy.

¶43 Next, I turn to the second basis for *Mount*'s conclusion that the right of privacy was unprotected by the guarantee set forth by Article II, Section 28(2). Again, *Mount*'s terse analysis was less than perfectly lucid, but it conducted the following analysis regarding the constitutionality of the then-existing version of SVORA under Article II, Section 10:

> The language of Article II, Section 28, of the Montana Constitution does not afford Mount the benefit he seeks here. The right of individual privacy under Article II, Section 10, of the Montana Constitution is a fundamental right. This requires that any legislative infringement of the right be subject to strict scrutiny analysis; be justified by a compelling state interest; and be narrowly tailored to effect [sic] only that interest.
> While Mount's right to privacy may be implicated by having to register and disclose his whereabouts, we conclude that the State had a compelling interest in enacting the Act. As discussed at length above, the Act was adopted to protect the public from the recidivism of sex offenders; to prevent victimization of vulnerable children; and to assist law enforcement in keeping track of the whereabouts of sex offenders. Also, as discussed above, the Act is narrowly tailored in its registration and disclosure requirements to effect only those purposes in a reasonable manner.

*Mount*, ¶¶ 98-99.

¶44 This reasoning contains a fatal flaw. The defendant in *Mount*, as in the present case, did not argue that the SVORA restrictions themselves must be struck down as an unconstitutional violation of Article II, Section 10's right to privacy.[5] *Cf.*, *State v. Brooks*, 2012 MT 263, ¶ 20, 367 Mont. 59, 289 P.3d 105 (upholding constitutionality of the

---

[5] *Wagner* likewise read *Mount*'s strict scrutiny analysis as answering the question of "whether SVORA infringed on the fundamental right to privacy" and then (inexplicably) concluding that "[f]or that reason . . . privacy was not a right protected under Article II, Section 28." *Wagner*, ¶ 13 (citing *Mount*, ¶ 95).

*prospective* application of SVORA as part of a sentence from Article II, Section 10 right to privacy challenge). Of course, the State may impose significant privacy restrictions as part of a sentence. *See, e.g., State v. Hotchkiss*, 2020 MT 269, ¶ 19, 402 Mont. 1, 474 P.3d 1273 (probationer has "a reduced privacy interest" allowing prohibition of sex offender probationer from installing encryption software intended to conceal internet activity). Rather, the contention was (and is) that the *retroactive* application of these privacy intrusions, not imposed as part of a sentence, violates the guarantee under Article II, Section 28(2) that rights be fully restored at the end of a sentence. As set forth above, the right to privacy set forth by Article II, Section 10 is nested within Article II, Section 28(2).

¶45 *Mount's* apparent logic—that Article II, Section 28(2) does not guarantee the restoration of any rights that the State could constitutionally deprive an individual of while serving a sentence—renders the guarantee of the restoration of "full rights" meaningless. Those serving sentences experience far more circumscribed freedoms than what are constitutionally guaranteed to the public at large. *See, e.g., Worden v. Mont. Bd. of Pardons & Parole*, 1998 MT 168, ¶¶ 34-35, 289 Mont. 459, 962 P.2d 1157 ("[T]he State may limit or abrogate the rights of an Inmate, as long as it is done to prevent further offenses or for reformation of the Inmate."). Under *Mount's* reasoning, any right that could be withheld from an individual serving a sentence could also be withheld upon completion of that sentence—a conclusion entirely incompatible with any reasonable understanding of the word "restore[]," as used in Article II, Section 28(2). *See* American Heritage Dictionary of the English Language, 3d. ed. (1992) (defining "restore" as "**1.** To bring back into existence or use; reestablish . . . **2.** To bring back to an original condition."). Clearly, the

"full rights" to which Article II, Section 28(2) envisioned an individual being "restored" were those the individual enjoyed before their sentence, not during it. *See* Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1800 (Delegate James introducing the provision as intended to ensure that an individual completing his or her sentence "be restored to the same rights, privileges and immunities as other citizens"); § 46-18-801(2), MCA ("[I]f a person has been deprived of a civil or constitutional right by reason of conviction for an offense and the person's sentence has expired or the person has been pardoned, the person is restored to all civil rights and full citizenship, *the same as if the conviction had not occurred*." (emphasis added)); *Gafford*, 172 Mont. at 389-90, 563 P.2d at 1134 (Article II, Section 28(2) refers to "the panoply of *rights possessed by all citizens under the laws of the land*" (emphasis added)). *Mount*'s second line of reasoning supporting its conclusion that the SVORA retroactive privacy restrictions do not implicate Article II, Section 28(2) is, like the first, an unambiguous error and manifestly wrong.

¶46 Because *Mount's* holding regarding the constitutionality of SVORA under Article II, Section 28(2) is based upon two demonstrable legal and logical fallacies, it is manifestly wrong and not entitled to our usual deference to precedent pursuant to the doctrine of *stare decisis*. *Beckman*, ¶ 20; *Jacobsen*, ¶ 30. I would, therefore, overrule *Mount* and its successor, *Wagner*, to the extent they are inconsistent with this Special Concurrence.

¶47 I now examine the question of whether SVORA's retroactivity, as currently applied, infringes upon Hinman's right to the full restoration of his rights upon termination of his state supervision as guaranteed by Article II, Section 28(2). At the time of his 2019 SVORA conviction, Hinman had completed both his twelve-year sentence and the

26

subsequent ten-year registration requirement applicable under the then-existing registry statute. He had therefore "terminat[ed] state supervision for" his 1994 conviction when he was subjected to the modern SVORA statute. For restoration of rights purposes, as noted above, the correct comparison of post-supervision rights is not to the level of rights he had as a prisoner or probationer, but to the level of protections enjoyed by the general public or which Hinman would have had if the conviction had never occurred. Several examples are illustrative here. If Hinman had never been convicted, Hinman could not have been forced to accompany police to the police station without probable cause and a warrant or applicability of a narrowly-drawn exception. *Hayes v. Florida*, 470 U.S. 811, 815, 105 S. Ct. 1643, 1646 (1985) (noting that it had never "sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization"). Hinman could not have been forced to answer law enforcement's questions. *Davis v. Mississippi*, 394 U.S. 721, 727 n.6, 89 S. Ct. 1394 (1969) ("[While] the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer."). Hinman certainly could not have been forced to submit to collection of a DNA sample without a warrant and probable cause. *Friedman v. Boucher*, 568 F.3d 1119, 1124 (9th Cir. 2009) (warrantless, suspicionless taking of detainee's DNA violated constitutional rights because "there is no question that the buccal swab constituted a search" requiring a warrant or a well-defined exception to the warrant requirement). These

27

are the rights to which Hinman once again became entitled upon "termination of state supervision for" his 1994 conviction.[6]  Mont. Const. Art. II, Section 28(2).

¶48     The modern version of SVORA, however, requires registrants to appear in person before law enforcement to provide a wide range of personal information (including email addresses and social media accounts, vehicle and license plate information, and workplace and school information, and "any other information required by the department of justice"), in addition to fingerprints and DNA sampling.  Section 46-23-504(3), (6)(c), MCA. Individuals who, like Hinman, are transient, must check in with law enforcement in person every month.  Section 46-23-504(5), MCA.  Furthermore, registrants must re-register, in person, any time they leave their county of residence for ten days or more, appearing before law enforcement in whatever county they travel to and again in their home county upon return.   Section 46-23-505(4)-(5), MCA.[7]   Thus, it is clear that, under retroactive application of the modern SVORA, Hinman does not enjoy the same freedom from compulsion to present himself to law enforcement for extraction of personal information and warrantless searches of his body that he would have had "if the conviction had not occurred."  Section 46-18-801(2), MCA.

---

[6] Notably, Hinman and the State would have negotiated his plea deal with reliance upon the expectation that Hinman's rights would be fully restored upon completion of the sentence rather than subjected to after-the-fact extensions of supervision.

[7] Hinman also would have had a constitutional "right to travel," absent a conviction.  *Saenz v. Roe*, 526 U.S. 489, 500, 119 S. Ct. 1518, 1525 (1999) (discussing "right to travel"); *Tubaugh v. Jackson (In re C.J.)*, 2016 MT 93, ¶ 21, 383 Mont. 197, 369 P.3d 1028 ("The right to travel has long been recognized as a fundamental constitutional right." (citation omitted)).

¶49 These restrictions were—critically—not imposed *prospectively* upon Hinman as a supervisory portion of his sentence; rather, they were imposed retroactively. The modern version of SVORA, when imposed prospectively at the time of sentencing, clearly constitutes a form of "state supervision" for an offense under Article II, Section 28(2). *See Doe v. Dep't of Pub. Safety & Corr. Serv.*, 430 Md. 535, 562 (2013) (noting that Maryland's similar sex offender registry "obligations have the same practical effect as placing [the registrant] on probation or parole"); Webster's New World Dictionary, Second College Edition (1976) (defining "supervise" as "to oversee, direct, or manage (work, workers, a project, etc.); superintend"). Thus, when the SVORA restrictions are imposed *prospectively* at the time of sentencing, "supervision" for purposes of Article II, Section 28(2) does not terminate until the registration requirement is completed, regardless of how long that registration extends beyond the completion of incarceration, parole, and probation. As such, entitlement to restoration of "full rights" will not be triggered until completion of the registration period designated at the time of sentencing and the deprivation of privacy rights, no matter how great, during the interim poses no Article II, Section 28(2) problem. In contrast, *retroactive* application of SVORA upon individuals who, like Hinman, have already terminated their period of state supervision clearly impinges upon the Article II, Section 28(2) guarantee that such individuals are entitled to their full rights.

¶50 My analysis does not, however, end there. If a law's challenger has successfully shown that a law substantially interferes with the "exercise of a fundamental right," the government may nevertheless attempt to bear the burden of demonstrating that exceptional

circumstances militate against this Court declaring the law unconstitutional, *i.e.*, by showing that the law survives strict scrutiny analysis. *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996) (citing *Arneson v. Mont. Dep't of Admin.*, 262 Mont. 269, 272, 864 P.2d 1245, 1247 (1993)). A fundamental constitutional right is a right either explicit in the federal or state constitution or one manifestly implicit from explicit constitutional rights. *Wadsworth*, 275 Mont. at 299, 911 P.2d at 1171-72. Under this standard, the State has the burden of showing that the challenged law is narrowly tailored, or the least restrictive available means, necessary to further a compelling state interest. *McDermott v. State Dep't of Corr.*, 2001 MT 134, ¶ 31, 305 Mont. 462, 29 P.3d 992; *Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, 989 P.2d 364; *see Stand Up Mont. v. Missoula Cnty. Pub. Schs.*, 2022 MT 153, ¶ 28, 409 Mont. 330, 514 P.3d 1062 ("least restrictive means" is "understood as part of the consideration of whether a government action is 'narrowly tailored'" (citing *Roman Catholic Diocese v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 67 (2020))); *Gryczan v. State*, 283 Mont. 433, 453, 942 P.2d 112, 124 (1997) (determining that criminal prohibition on "sexual contact" between individuals of the same sex did not survive strict scrutiny where evidence demonstrated that law *did not in fact further asserted interest* in preventing the spread of HIV and prohibited a wide range of behavior unrelated to the spread of HIV); *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325, 2338 (2003) ("When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied."). In contrast to statutes that do not infringe upon a constitutional right and which are therefore presumed

30

constitutional and subject to only rational basis review, upon the challenging party's threshold showing of a substantial infringement of a fundamental right, the burden shifts to the government to show that the statute survives strict scrutiny analysis. *Compare Cooper v. Harris*, 581 U.S. 285, 291, 137 S. Ct. 1455, 1463-64 (2017) (presumption of constitutionality overcome by challenging party's showing of threshold infringement of constitutional right—on strict scrutiny review the burden then shifts to defender to show statute survives strict scrutiny), *with Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2642-43 (1993) (state has no burden to demonstrate constitutionality of statute subject only to rational basis scrutiny).

¶51    Here, the State does not provide this Court with an asserted compelling government interest supporting SVORA's retroactivity, relying instead solely on its argument that the ruling in *Mount* must be followed pursuant to *stare decisis*.  Thus, notwithstanding its erroneous framing of the question, I consider the two interests set forth by *Mount* as supporting the 2003 version of SVORA: (1) "assist[ing] law enforcement in keeping track of the whereabouts of sex offenders" and (2) protecting the public from the recidivist sex offenders.  *Mount*, ¶ 99;[8] *see also* 1997 Mont. Laws ch. 375 (amending SVORA and finding "protection of the public from [sexual and violent] offenders is of paramount concern to the government" and that gathering and releasing the required information would "further the primary governmental interest of protecting specific vulnerable groups and the public in general from potential harm").  The first asserted interest is an aberration

---

[8] *Mount* also listed a third interest: "prevent[ing] the victimization of vulnerable children." *Mount,* ¶ 99.  I analyze that interest concurrently with that of protecting the public.

in strict scrutiny jurisprudence: my search of our caselaw did not return a compelling government interest in "keeping track of the whereabouts" of individuals not currently under state supervision, particularly without reasonable suspicion, probable cause, or any other level of individualized objective facts, circumstances, or reason to believe the individual poses an imminent threat. Recognizing such an interest as "compelling" eviscerates our entire body of privacy and search and seizure caselaw acknowledging very significant constitutional restraints on law enforcement's ability to "keep[] track" of individuals, including those suspected of very serious crimes. *Mount* was manifestly wrong in finding such an interest compelling.

¶52     Next, I turn to *Mount's* second interest. Assuming, without deciding, that protecting the public from sexual or violent crimes committed by those previously convicted of a sexual or violent offense is sufficiently exceptional among the litany of indisputably important public safety challenges to constitute a government interest deemed compelling, the State has still failed to carry its burden under the strict scrutiny analysis. For one, neither the State nor *Mount* points to any evidence that the challenged law actually furthers this asserted interest.[9]  *See Grutter*, 539 U.S. at 327, 123 S. Ct. at 2338 (challenged state

---

[9] To the contrary, courts have noted some growing doubt regarding the efficacy of sex offender registration requirements in general. *See People ex rel. T.B.*, 489 P.3d 752, 768 (Colo. 2021) ("[A] number of studies indicate that registration requirements have no statistically significant effect on reducing recidivism rates among offenders.") (citing Molly J. Walker Wilson, *The Expansion of Criminal Registries and the Illusion of Control*, 73 La. L. Rev. 509, 523 n.93 (2013) (collecting studies)); *People v. Betts*, 507 Mich. 527, 560, 968 N.W.2d 497, 514 (Mich. 2021) ("[A]t minimum, the [registry's] efficacy is unclear.") (citing United States Department of Justice, Alper & Durose, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-2014)* (May 2019), https://perma.cc/N3TZ-CX2M (concluding that sex offenders are less likely than other offenders to be rearrested for any crime); Beth Huebner et al., *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri*, https://perma.cc/6H29-PLPF

action must actually "further" compelling interest); *Gryczan*, 283 Mont. at 453, 942 P.2d at 124 (examining HIV research report and concluding that challenged law did not actually further asserted government interest in controlling the spread of HIV).[10] Unlike in rational basis review, here, where Hinman has shown that the challenged law significantly impinges upon a fundamental right, the burden lies on the State to demonstrate, by more than mere unsupported assertions, that the law should nonetheless be upheld. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 800, 131 S. Ct. 2729, 2739 (2011) (rejecting the State of California's assertion that psychological studies correlating exposure to violent video games to asserted harmful effects on children was competent evidence of a causal link sufficient to manifest a compelling state interest for purposes of strict scrutiny); *Gryczan*, 283 Mont. at 453, 942 P.2d at 124 (examining HIV research contravening state's assertion that challenged law served government interest in controlling the spread of HIV).

¶53 Moreover, a less restrictive alternative exists. *See Stand Up Mont.*, ¶ 28 (discussing least restrictive means requirement for strict scrutiny). As noted above, the government is free to impose any restraints it wishes (including either supervision or incarceration), for as long as it wishes, upon those convicted of whichever crimes it wishes, without running afoul of the guarantee set forth by Article II, Section 28(2) so long as it does so

---

(concluding that residency restrictions "are unlikely to mitigate or reduce the risk of recidivism among sex offenders"); J.J. Prescott & Jonah Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & Econ. 161, 192 (2011) (concluding that notification requirements in a typical sex-offender registry, counterintuitively "effectively *increases* the number of sex offenses by more than 1.57 percent" (emphasis added))).

[10] SVORA now not only applies to sexual and violent offenses, but also to arson and unlawful operation of a clandestine laboratory. Section 46-23-502(13)(a), 45-6-103, 45-9-132, MCA.

*prospectively* as part of a sentence. For purposes of Article II, Section 28(2), the constitutional method of engaging in the sort of surveillance SVORA provides for is to impose its requirements as part of a criminal defendant's sentence, without resorting to the retroactive, after-the-fact, imposition at issue here. *See Brooks*, ¶ 20 (upholding *prospective* application of the 2011 SVORA registry pursuant to Article II, Section 10 right to privacy challenge).[11]

¶54 To the extent that the State now wishes to monitor those who, like Hinman, committed their crime before the Legislature amended SVORA to become the more intrusive surveillance instrument that it now is, the State fails to demonstrate that this particular cohort of individuals poses such an exceptional threat to public safety, unamenable to any less-intrusive mitigation measures, such as to justify the extraordinary course of action of upholding a law that clearly impinges upon Article II, Section 28(2). *See Brown*, 564 U.S. at 800, 131 S. Ct. at 2739 (rejecting state's assertion that the asserted harm was caused by the activity targeted by the challenged law); *Gryczan*, 283 Mont. at 453, 942 P.2d at 124 (examining evidence regarding whether challenged law actually served the asserted interest in combatting spread of HIV). Law enforcement, of course, possesses a number of tools with which to pursue its mandate to protect the public. The State fails to demonstrate that these have become futile in the face of the hazard posed by this particular group of individuals. And, as noted, the State has numerous tools available

---

[11] *See also* § 46-18-202(1), MCA (district courts empowered to impose probationary and other conditions that are "reasonably related to the objectives of rehabilitation and the protection of the victim and society"); § 46-18-201(7), MCA (prohibiting sentencing judges from waiving SVORA registration requirements for SVORA crimes).

to protect the public during a convicted felon's period of probation or registration as imposed by the court as part of a sentence. Again, this concurrence says nothing about the continuing vitality of SVORA so long as its requirements are imposed *prospectively*, as part of a sentence, rather than retroactively (thereby denying an individual the full restoration of rights upon completion of a sentence as guaranteed by the Montana Constitution).

¶55 Strict scrutiny review provides "a safety valve in the event of a 'hard case,' where the governmental and societal reasons for infringing upon an individual right are particularly strong." *See* Ashutosh Bhagwat, *Hard Cases and the (D)Evolution of Constitutional Doctrine*, 30 Conn. L. Rev. 961, 970 (1998); *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 741, 116 S. Ct. 2374, 2384-85 (1996) (in First Amendment context, strict scrutiny enforces "the Constitution's constraints, but without imposing judicial formulas so rigid that they become a straightjacket that disables government from responding to serious problems"); Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1303 (2007) ("According to one account, the purpose of strict scrutiny is to protect rights that are so constitutionally preferred that they can be infringed, if at all, only to avert imminent catastrophic harms."). A "safety valve" is not a floodgate, and the lessons of history demand extreme caution when faced with calls to trade away core constitutional rights to benefit even the most inarguably-important government interests, particularly when the extent of those benefits are incremental or uncertain. *E.g., Korematsu v. United States*, 323 U.S. 214, 245, 65 S. Ct. 193, 207 (Jackson, J., dissenting) (dissenting to ruling upholding exclusion of all persons of Japanese ancestry

35

from west coast and placement in internment camps in the absence of any "evidence whatever on th[e] subject" of the government's alleged "necessity" of the exclusion to reduce the risk of sabotage during World War II, noting that the precedent would "lie[] about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need");[12] *Buck v. Bell*, 274 U.S. 200, 205-07, 47 S. Ct. 584, 584-85 (1927) (upholding forced sterilization of woman state asserted to be "feeble-minded" because "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit  from continuing their kind. . . .  Three generations of imbeciles are enough.").[13]  Even if strict scrutiny is not necessarily "fatal in fact," as the famous aphorism once claimed, neither is it "feeble in fact." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 314, 133 S. Ct. 2411, 2421 (2013).  Where, as here, a law has been shown to constitute a serious infringement upon the core of a fundamental constitutional right, this Court is bound to declare it unconstitutional unless the State can show exceptionally pressing circumstances and the most careful of government responses.  It has not done so here.

¶56    I would conclude that Hinman's failure-to-register conviction must be reversed because it was applied in violation of the restoration of rights that Hinman was guaranteed

---

[12] *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("[E]xpress[ing] what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution" (internal quotation omitted)).

[13] *See Skinner v. Oklahoma*, 316 U.S. 535, 542, 62 S. Ct. 1110, 1114 (1942) (holding Oklahoma's "Habitual Criminal Sterilization Act" unconstitutional).

after he discharged his 1994 sentence. The SVORA provisions under which Hinman was charged were enacted well after he was sentenced and discharged that sentence, denying him the full restoration of his rights guaranteed by Article II, § 28(2).

¶57 In short, I would, like the Majority, reverse the District Court's October 7, 2019 order denying Hinman's motion to dismiss the charge against him. However, I would resolve the question of the retroactive application of SVORA to Hinman on restoration-of-rights grounds, and, consequently, do not reach Hinman's alternative argument raising the *ex post facto* clause in Article II, § 31, of the Montana Constitution.[14]

/S/ MIKE McGRATH

Justice Dirk Sandefur, concurring.

¶58 I concur in and have joined the Court's sound analysis and Opinion to the extent that it reverses and holds that the current, post-2007 version of the Montana SVORA, as repeatedly amended in 2007 through 2017, is punitive in effect, *as retroactively applied* to Hinman, in violation of Montana Constitution Article II, Section 31 (ex post facto law prohibition). I would go further and overrule *State v. Mount*, 2003 MT 275, ¶¶ 28-90 and 101, 317 Mont. 481, 78 P.3d 829 (holding that retroactive pre-2007 Montana SVORA was not a punitive ex post facto law in violation of Montana Constitution Article II, Section 31—following *Smith v. Doe*, 538 U.S. 84, 92-106, 123 S. Ct. 1140, 1146-54 (2003)

---

[14] I would caution against anything in this Special Concurrence being interpreted to preclude sentencing courts from including registration requirements created by statute at the appropriate time—when the sentence is imposed on a qualified defendant.

37

(upholding similar Alaska sex offender registration scheme as retroactively applied under United States Constitution Article I, Section 10, ex post facto prohibition)). Aside from simply walking lockstep with the federal ex post facto analysis in *Smith*, our ex post facto analysis in *Mount* was manifestly erroneous under Montana Constitution Article II, Section 31, because we failed to critically look past the civil regulatory façade to the obvious punitive intent and effect of the pre-2007 SVORA as applied retroactively. *See Mount*, ¶¶ 103-05 (Leaphart, J., dissenting—citing *Smith*, 538 U.S. at 110-18, 123 S. Ct. at 1156 60 (Stevens, Ginsburg, and Breyer, JJ., dissenting)). *See similarly Doe v. State*, 189 P.3d 999, 1008-19 (Alaska 2008) (post-*Smith* holding that then-similar Alaska sex offender registration act was punitive as retroactively applied in violation of Alaska state constitutional ex post facto prohibition).

¶59 Moreover, while not necessary to the decision here in light of the manifest ex post facto defect in the current post-2007 Montana SVORA, and thus without concurring that we should instead separately reverse Hinman's conviction based on violation of Montana Constitution Article II, Section 28(2) ("[f]ull rights are restored by termination of state supervision [on] any [state criminal] offense"), I nonetheless concur with Chief Justice McGrath that we should overrule the balance of *Mount*, ¶¶ 91-101, and *Wagner v. State*, 2004 MT 31, ¶¶ 7-16, 319 Mont. 413, 85 P.3d 750, *partially overruled on other grounds by State v. Azure*, 2008 MT 211, ¶¶ 15-17, 344 Mont. 188, 186 P.3d 1269, to the extent they held that the restoration of rights provision of Montana Constitution Article II, Section 28(2), does *not* apply to the right to individual privacy co-guaranteed by Article II, Section 10, of the Montana Constitution. As aptly demonstrated by the Chief Justice, the express

38

Montana right to individual privacy is clearly included among the panoply of individual Montana constitutional rights, and other civil and political rights, to which the restoration of rights provision of Article II, Section 28(2), applies. Concurrence, ¶¶ 39-42 and 44-45 (McGrath, C.J., concurring). Our strained contrary holdings in *Mount* and *Wagner* unsoundly exclude the co-guaranteed right to individual privacy from the broad and unrestricted restoration of rights required by Article II, Section 28(2) without any textual basis in either co-equal Montana constitutional provision, and in utter disregard of the broader manifest intent and purpose of the Framers of our 1972 Constitution.

¶60 With proper recognition that the unrestricted language of Montana Constitution Article II, Section 28(2) clearly requires complete restoration of all civil rights upon termination of state supervision on discharge of a criminal conviction, *Mount* was also manifestly erroneous to the extent that it held that the acknowledged infringement of Mount's Montana constitutional right to individual privacy, occasioned by retroactive application of the pre-2007 SVORA, in any event survived strict scrutiny constitutional review. Concurrence, ¶¶ 50-55 (McGrath, C.J., concurring). Here, under the compelling government interest element of the strict scrutiny test 20 years after *Mount*, the State identifies and asserts no compelling government interest, beyond citation to *Mount* as controlling precedent, to support and justify the even more intrusive privacy and liberty restrictions now at issue under the post-2007 Montana SVORA. Under even the most cursory analysis, the State has manifestly failed to satisfy its burden of demonstrating a compelling government interest justifying those substantial infringements of Hinman's fundamental Montana constitutional privacy and due process liberty rights and interests,

39

and derivative Montana fundamental right to full restoration of rights upon pre-2007 discharge of his 1994 sexual assault conviction. To the extent that the State implicitly again asserts the government interests asserted in *Mount* to justify the pre-2007 SVORA intrusions and restrictions as justification for those now at issue under the current version of the SVORA (i.e., "assist[ing] law enforcement in keeping track of . . . sex offenders" and protecting the public, including children, from repeat sex offenders), then and now the State has conspicuously failed to make *any* evidentiary showing, beyond mere cursory assertion, of a compelling government interest in tracking fully-discharged prior sex offenders without any particularized suspicion that a particular individual continues to pose a risk to public safety. *See* Concurrence, ¶¶ 51-52 (McGrath, C.J., concurring). Moreover, neither our cursory analysis in *Mount*, nor the State's cursory assertions on appeal here, manifest or make *any* evidentiary or logical showing sufficient to satisfy the State's heavy burden under the second element of the strict scrutiny test to demonstrate that the privacy intrusions and liberty restrictions at issue under either version of the Montana SVORA were or are narrowly-tailored to further the government interest(s) asserted as justification therefor. *See* Concurrence, ¶¶ 52-55 (McGrath, C.J., concurring); *Mount*, ¶¶ 60, 74, 87-89, and 99. *See similarly* Opinion, ¶ 23 n.13. As the Legislature continues to grapple with the chasm between the continuing and bona fide public concern regarding the public safety risk of sex offender recidivism, and the lack of evidence-based justification for non-individualized monitoring and restrictions of all species of convicted sex offenders *after they have fully discharged their criminal sentences*, the focus should be on sound,

supported constitutional analysis, not our manifestly erroneous Montana constitutional ex post facto and restoration of rights analyses from 20 years ago in *Mount*.

/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson, concurring.

¶61 While I join in the Opinion, I take no position as to the analysis and rationale contained in Chief Justice McGrath's concurrence with regard to restoration of rights, the merits of which will no doubt be presented to us in a future case.

/S/ INGRID GUSTAFSON

Justice James Jeremiah Shea joins in the concurring Opinion of Justice Gustafson.

/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, dissenting.

¶62 "Statutes are presumed to be constitutional, and we regard that presumed constitutionality as a high burden to overcome." *Weems v. State*, 2023 MT 82, ¶ 34, 412 Mont. 132, ___ P.3d ___. "Every possible presumption must be indulged in favor of the constitutionality of a legislative act. . . . and, if any doubt exists, it must be resolved in favor of the statute." *Hernandez v. Bd. of County Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638. "[I]t is the duty of this Court to avoid an unconstitutional interpretation if possible." *Hernandez*, ¶ 15. "To do otherwise would infringe on the principle of separation of powers and the deference we give to the Legislature. . ." *Weems*,

41

¶ 34. Here, I believe there is a clear pathway under the governing standards to uphold the constitutionality of SVORA, as the Court has likewise previously determined, including the amendments enacted subsequent to *Mount*, and I would thus affirm the constitutionality of the statute.

¶63 Hinman, whose crime involved a sexual offense, is a Level 2 Offender. He brings a challenge to the requirements of the 2017 Act as applied to him—not a facial challenge as to all offenders, including the provisions applicable to Level 3 Offenders the Court finds troubling, but which are not at issue here. Further, as Hinman explained at oral argument, he does not challenge *Mount's* applicability to him, or ask that *Mount* or our other related precedent, such as *Wagner v. State*, 2004 MT 31, 319 Mont. 413, 85 P.3d 750, be overruled, except as applied to him. And, notably, the United States Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), from which we derived our test and much of our analysis, is still good law. These contours of appellate review and of *stare decisis* should guide our consideration.[1] To paraphrase, the SVORA framework and "[*Mount*] and [*Wagner*] have been the law of [Montana] for decades." *Dobbs*, 142

---

[1] "Following that 'fundamental principle of judicial restraint,' *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, at 450, 128 S. Ct. 1184, 170 L. Ed. 2d 151, we should begin with the narrowest basis for disposition, proceeding to consider a broader one only if necessary to resolve the case at hand. See, *e.g.*, *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S. Ct. 2465, 110 L. Ed. 2d 387 (1990). It is only where there is no valid narrower ground of decision that we should go on to address a broader issue. . . . *See Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U.S. 449, 482, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) (declining to address the claim that a constitutional decision should be overruled when the appellant prevailed on its narrower constitutional argument)." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2313, 213 L. Ed. 2d 545 (2022) (Roberts, C.J., concurring).

S. Ct. 2228, 2319 (Kagan, J., dissenting). They form the precedent that law enforcement and Montana citizens have relied upon for a long time.

¶64 We considered the 2001 version of SORA in *Mount* and held it was a nonpunitive, civil regulatory scheme that could be applied retroactively to offenders like Hinman. *Mount*, ¶¶ 48, 49, 90. Included within the Act as challenged were the components of lifetime registration, retroactive applicability, felony criminal liability for failure to comply with registration requirements, and restoration of rights under Article II, Section 28, of the Montana Constitution. *Mount*, ¶¶ 9, 29, 79, 100; *see also Wagner*, ¶ 16 (affirming our holding in *Mount* that SORA did not violate the restoration of rights clause). Given the case as presented, I will not revisit these components already addressed in *Mount*. They form a "constitutional core" of the Act, and thus I consider herein only the additions to the Act within the 2017 version under which Hinman was convicted for failure to register in this proceeding, and upon which he makes his challenge.

¶65 As a threshold matter, it is critical to understand an essential SVORA feature that impacts the applicability of the Act's conditions, and has a mitigating effect. Prior to sentencing, each convicted sexual offender is assessed by a professional evaluator who determines the risk of a repeat offense and the threat that an offender poses to the public safety. Section 46-23-509(1), MCA.[2] The evaluator provides a report to the district court and recommends a "level" designation for the offender, based on the results of the evaluation. Based upon the evaluation, the district court designates the offender as a

---

[2] If a year is not otherwise indicated for the statute cited, the 2001 and 2017 versions are identical.

Level 1, 2, or 3 offender. Section 46-23-509(2)(b), MCA. This individualized assessment of risk tailors SVORA's application to offenders. Hinman was designated a Level 2 offender, meaning he is considered a moderate risk of committing a repeat sexual offense. Section 46-23-509(2)(b), MCA. This designation determines how often he must update his registration status, how much of his personal information may be released to the public, and when he is able to petition to be removed from his lifetime registration obligation. Sections 46-23-504, -506, -508, MCA (2017). This three-tiered system remains virtually unchanged since our decision in *Mount*, and continues to limit Hinman's SVORA requirements, even those that have increased post-*Mount*.

¶66    Post-*Mount* amendments to SVORA have placed additional reporting requirements on Hinman. Rather than returning his updated registration form once a year by mail, Hinman, as a Level 2 offender, must now report twice a year in person to his local registration agency to update his registration and be photographed. As under *Mount*, Hinman still has 10 days to update his registration after receiving notice. Sections 46-23-504(4), MCA (2001); 46-23-504(6)(c), MCA (2017). Under *Mount*, if Hinman changed his residence, he was required to give written notification within ten days. Section 46-23-505(1), MCA (2001). Under the 2017 Act, if Hinman changes his residence, his name, or his employment or student status, he is required to report in person to his local registration agency within three days. Section 46-23-505(1), MCA (2017). If Hinman leaves his county of residence for more than ten consecutive days, he must register in the county in which he is physically located by the eleventh day, and must register in his county of residence when he returns. Section 46-23-505(4), MCA (2017). If Hinman travels to

44

another county, with the purpose of setting up a temporary residence there for ten or more days, or for an aggregate of more than 30 days in a year, he is required to register at the local registration agency in that county within three business days. Section 46-23-504(1), MCA (2017). Under *Mount*, Hinman had ten days to do the same. Section 46-23-504(1), MCA (2001). In summary, Hinman will now have to report in person at least two times annually, and, depending on his life decisions, may report a few more times during certain years. He has less time to report under certain circumstances, but not for his primary annual updates to his registration.

¶67 Notably, Montana SVORA does not place geographic restrictions on where Hinman can live or work. *See Mount*, ¶ 55; *Smith*, 538 U.S. 84, 100, 123 S. Ct. 1140, 1151. This is a significant difference between the Montana Act and the acts adopted by other states, and is mitigating. *Cf. People v. Betts,* 507 Mich. 527, 535, 968 N.W.2d. 497 (2021) (amendments to state registry law created "exclusion zones" that "prohibited most registrants from living, working, or 'loitering' within 1,000 feet of a school"); *State v. Williams*, 129 Ohio St. 3d 344, 348, 2011 Ohio 3374, 952 N.E.2d 1108 (2011) (additional requirement prohibited "all classified sex offenders, not just those convicted of sex offenses against children, from residing within 1,000 feet of any school premises"); *Starkey v. Okla. Dep't of Corr.*, 2013 OK 43, ¶ 50, 305 P.3d 1004 (2013) (regardless of whether the offender's victim was a minor or an adult, all offenders were not allowed to reside within 2000 feet of schools, playground, parks, or child care centers). Under the Montana Act, only "high risk" Level 3 offenders who are convicted of a sexual offense against a victim

45

12 years old or younger are subject to restrictions on the place of their residence or employment. Section 45-5-513, MCA (2017).

¶68 Regarding relief from the registration requirement, under *Mount*, Hinman was subject to lifetime registration, but could petition for relief of his obligation after 10 years. Section 46-23-506(3), MCA (2001); *Mount*, ¶¶ 29, 55. Now, he is required to register for 25 years before petitioning for relief, an increased time period which the Legislature intended to reflect the individualized risk Level 2 offenders pose to the community. Section 46-23-506(3), MCA (2017). The criteria for obtaining relief from registration remains unchanged post-*Mount*. Sections 46-23-506(3)(a-b), MCA (2001); 46-23-506(3), MCA (2017). Likewise unchanged, but mitigating, is the option for Hinman to complete a sexual offender treatment program and to petition the district court for reclassification as a Level 1 offender, under which he would be eligible for relief from the registry in less time. Section 46-23-509(3), MCA.

¶69 "[T]he more minor and indirect the restraint or disability, the more likely such restraint or disability is nonpunitive." *Mount*, ¶ 54 (citing *Smith*, 538 U.S. 84, 99-100, 123 S. Ct. 1140, 1151). While the post-*Mount* amendments make the restraint on Hinman more direct, particularly through the in-person reporting requirement, the restraint is still relatively minor, particularly viewed with the mitigating features of the Act, and I would conclude the Act does not impose a punitive level of restraint.

¶70 Regarding publicly distributed information about Hinman, a search on the Department of Justice's SVORA database reveals that the public can currently view the following information about Hinman online: his full name and aliases; a recent photograph;

46

his age, date of birth, and last known address; his registration agency; his physical description; the sexual offense for which he was convicted and his date of sentencing; and the age and gender of his victim. The website also informs the public that Hinman is a Level 2 Sexual Offender and offers a link to an informational webpage explaining the tiered system. The amount of information about Hinman released to the public is again tied to his designation as a Level 2 offender. Section 46-23-508(1)(b)(iii), MCA (2017).

¶71 Hinman's offender level, his address, and the age and gender of his victim is information directly related to the purpose of the registry—informing the community, particularly parents, of information that may be helpful to protect children. For instance, if a parent of a child fitting the description of Hinman's victim knew Hinman lived in the neighborhood, the parent could use this information to make decisions about the child's safety. In this way, the online registry differs from punitive probation.[3] In addition, the law upheld in *Smith* authorized public distribution of very similar information online, with the addition of the description, license, and identification numbers of the offender's vehicles, place of employment, and further information about the offender's conviction and sentence. *Smith*, 538 U.S. 84, 123 S. Ct. 1140.

---

[3] The Montana Department of Corrections' website also has an offender database. This public database currently includes Hinman because he is on probation for the failure to register the conviction at issue in this case. Hinman's offender level, address, and victim information are not listed there. The other information is similar but also includes details about sentences and information about other convictions. The difference in information displayed reflects the two databases' differing purposes.

¶72 Under *Mount*, Hinman had to submit to fingerprinting and a photograph upon registration. Section 46-23-504(3), MCA (2001). Post-*Mount* amendments now require him to provide the registration agency with: his name and any aliases, his social security number, his residence information, the name and address of place of employment, name and address of any school where he is a student, his driver's license number, a description and license number for any vehicles owned or operated by Hinman, all of Hinman's email-addresses and social media screen names, and a DNA sample.[4] Section 46-23-504(3), MCA (2017). However, this does not mean that all of this information is released to the public. Section 46-23-508, MCA (2017).[5]

¶73 I believe that three considerations—the Act's tailoring to reflect individualized community risk through the three-tiered system, that Hinman can live or work without geographic restriction, and Hinman's ability to petition for relief from his lifetime registration obligation, including in a shorter timeframe if he completes treatment—all mitigate against a conclusion that the post-*Mount* amendments render the 2017 version of SORA excessive or punitive in light of its nonpunitive purpose. *See Mount*, ¶¶ 86-88; *Smith*, 538 U.S. at 102-105, 123 S. Ct. at 1152-1154. In this way, the Montana statute is distinguishable from the law upheld in *Smith* but later struck down as punitive by the

---

[4] Montana started collecting DNA samples of those "convicted of a sexual or violent offense" as early as 1998. Section 44-6-103(1), MCA (1998).

[5] The Department must release "any offender registration information that it possesses relevant to the public if the [D]epartment of [J]ustice or the registration agency determines that a registered offender is a risk to the safety of the community and that disclosure of the registration information that it possesses may protect the public." Section 46-23-508(1)(b), MCA (2017). A nearly identical provision existed when we decided *Mount*. *Mount*, ¶ 85.

Alaska Supreme Court in *Doe v. State*. There, in concluding Alaska's sex offender registry law was excessive, the Alaska Supreme Court observed that the law "neither meaningfully distinguishes between classes of sex offenses on the basis of risk nor gives offenders any opportunity to demonstrate their lack of risk." *Doe*, 189 P.3d at 1019. The law also provided "no mechanism by which a registered sex offender can petition the state or a court for relief from the obligations of continued registration and disclosure." *Doe*, 189 P.3d at 1017. Both the 2001 and 2017 versions of SORA/SVORA give Hinman these opportunities and individualized consideration.

¶74 In my view, the increased obligations upon Hinman as a Level 2 offender, upon the core constitutional requirements of the Act as upheld in *Mount*, represent incremental changes that are mitigated by the above-referenced provisions and are, on balance, nonpunitive as applied to Hinman. The Court now declares the Act imposes "stigma and other collateral effects," but that statement is *ipse dixit* and contrary to our precedent that the Act "do[es] not promote retribution" and has the legitimate purposes "to protect the public from the recidivism of sex offenders; to prevent victimization of vulnerable children; and to assist law enforcement in keeping track of the whereabouts of sex offenders," for which the State has "a compelling interest [to] enact[]." *Mount*, ¶¶ 75, 99.

¶75 I would affirm.

/S/ JIM RICE

Justice Beth Baker joins in the dissenting Opinion of Justice Rice.

/S/ BETH BAKER

49